**MARION SQUARE CORPORATION, a West Virginia corporation; Marion Associates Limited Partnership, a West Virginia limited partnership, Plaintiffs–Appellants,**

v.

**The KROGER CO., an Ohio corporation, Defendant–Appellee.**

No. 88–3835.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1988.

Decided April 24, 1989.

Kevin B. Burgess (Hamilton, Mooney, Burgess, Young & Tissue, Oakhill, W. Va., on brief), for plaintiffs-appellants.

Mark A. Swartz (Kevin A. Nelson, Love, Wise & Woodroe, Charleston, W. Va., on brief), for defendant-appellee.

Before ERVIN, Chief Judge, WINTER, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.

PER CURIAM:

Upon statute of frauds grounds, the district judge declined to enforce an agreement for the cancellation of a lease. She thought that the writings exchanged between the parties did not adequately fix the date upon which the cancellation of the lease was to be effective and that they did not sufficiently describe the equipment to be sold. Concluding that neither ground is tenable, we reverse and remand with instructions to award appropriate damages to the lessor.

## I.

Marion Square was the owner of a shopping center in West Virginia. In the late 1970s it leased one of its stores for a twenty-year term to The Kroger Co. for the operation of a grocery store. In December 1985, however, Kroger sought to be relieved of its obligations as lessee of that store. David J. Rowe, Kroger's regional real estate manager, informed William Abruzzino, Marion Square's chief executive officer, that Kroger wished to terminate the lease as soon as possible. Toward that end, Kroger sent to Marion Square a partially completed, but unsigned, cancellation agreement.

As part of the lease cancellation agreement, it was contemplated that Kroger would sell and Marion Square would purchase the equipment that Kroger had installed in the premises. Rowe sent a written offer to sell that equipment for $188,464. That offer was rejected by Abruzzino, but, in telephonic negotiations the next day, the two men agreed upon a price of $44,000 for the equipment.

On February 18, 1986 Rowe wrote two letters to Abruzzino. In the first, he stated:

I am including a revised copy of Kroger's intent to cancel the subject store lease. This letter will confirm our understanding that you have agreed to purchase our existing equipment at $44,000. Such an agreement will be between Kroger and yourself and I will expect this to be part of our verbal agreement with you.

In the second letter Rowe stated:

Pursuant to our telephone conversation today, this letter shall serve as our company's intent to execute a cancellation agreement relative to the captioned store subject to receiving same from you.

It is my understanding that you have or will shortly be receiving Kroger cancellation forms via Jim Boeckmann of my department. Please arrange to have these fully executed and returned directly to my attention for General Office processing.

Meanwhile, Marion Square was attempting to negotiate a lease with Giant Eagle, a chain store grocery company, for the premises to be vacated by Kroger. It was contemplated that Giant Eagle would purchase from Marion Square the equipment that Marion Square was expected to purchase from Kroger. Kroger knew of the efforts by Marion Square to obtain a replacement tenant. Indeed, the two letters of February 18, 1986 were written so that the availability of the premises could be demonstrated to Giant Eagle.

Shortly after receipt of those two letters, Marion Square contracted to lease the premises to Giant Eagle. It agreed to sell to Giant Eagle the equipment to be purchased from Kroger, and Giant Eagle agreed to purchase that equipment.

On April 3, 1986, however, Kroger informed Marion Square that it did not wish to cancel the lease.

## II.

■ As in most states, in West Virginia a contract for the cancellation of a long-term lease is unenforceable "unless the contract or some note or memorandum thereof be in writing and signed by the party to be charged thereby...." W.Va. Code § 36–1–3 (1985 & Supp.1988); *see* *Kennedy v. Burns*, 84 W.Va. 701, 101 S.E. 156, 159 (1919). All essential terms of the cancellation agreement must be included in the writing. *Harper v. Pauley*, 139 W.Va. 17, 81 S.E.2d 728, 731 (1953).

Kroger contends that the effective date of the cancellation agreement was a material term.

Generally, and in an abstract sense, the effective date of a lease cancellation agreement is a material term of the agreement. Here, however, the parties were not discussing some vague time in the distant future. Kroger wished to have its lease cancelled as soon as possible. Nothing suggests any negotiable difference between the parties about the subject.

Kroger wished to be relieved of its obligations under the lease. It was bound through all the remainder of the term of the twenty-year lease. It could not expect cancellation of its lease for nothing. The obvious expectation of the parties was that Kroger not be relieved until Marion Square had obtained a substitute tenant ready to enter and to begin the payment of rents. The objective made cooperation between the parties appropriate, and the parties appropriately entered upon that course. Marion Square began negotiating a new lease with Giant Eagle while Kroger sent its letters declaring its intent to execute the cancellation agreement in order that Marion Square could demonstrate to Giant Eagle the availability of the Kroger premises. Meanwhile, of course, the parties were negotiating for the purchase by Marion Square of Kroger's equipment in the store and its resale by Marion Square to Giant Eagle. Thus arranged, Kroger's removal from the store could be coordinated with Giant Eagle's entry. The circumstances fully explain the absence of any negotiations between the parties about the precise date upon which the cancellation of the lease would become effective.

When time is not of the essence, the law will imply a reasonable time. *Williston on Contracts* § 575 (3d ed. 1961); *cf. Lewis v. West Va. Pulp & Paper Co.,* 76 W.Va. 103, 84 S.E. 1063, 1064 (1915). The mutual intention of the parties to effectuate a cancellation of the lease as soon as possible can supply an even more precise date for effectuation of the cancellation. That date would be precisely fixed by Giant Eagle's readiness to take possession.

### III.

■ West Virginia's statute of frauds relating to the sale of goods provides:

Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

W.Va.Code § 46–2–201(1) (1966 & Supp. 1988).

We cannot agree, however, that the quantity of the equipment to be sold was unspecified in the writings. Kroger proposed to sell "existing equipment" in the leased premises. The equipment actually there was intended to be sold, but no one thought that there was any intention to effect a sale of any other equipment than that to be seen upon an inspection of the store facility. Kroger's wish to vacate expeditiously by selling its existing equipment to Marion Square would permit it to pick up and leave promptly after removal of its inventory.

In the analogous field of land contracts, it is held that " '[in] description, that is certain which can be made certain.' " *E.g., Jones v. Hudson,* 160 W.Va. 518, 236 S.E. 2d 38, 40 (1977) (*quoting Holley's Ex'r v. Curry,* 58 W.Va. 70, 51 S.E. 135, 136 (1905)). Here, the description of the existing equipment in the store building is certain enough. If more detail were wished, upon an inspection, either party could have made a detailed inventory. The statute of frauds requires no more.

### IV.

■ In April 1986, when Kroger reversed its announced intention to procure a

cancellation of the lease, it attempted to explain that cancellation of the lease had not been approved by the principal executives of the company in Cincinnati. Rowe, however, was the regional real estate manager. He was provided with assistants and a staff. He supplied Kroger's lease cancellation forms that were incomplete, but seemingly only because the final details remained to be agreed upon. He spoke with every appearance of authority, never once suggesting that he was speaking tentatively subject to later approval from Cincinnati. Under the press of asserted haste on Kroger's part, he urged Marion Square to action, and Marion Square actually committed itself to lease the store and sell the existing equipment to Giant Eagle.

When Kroger changed its mind, it was much too late to claim that Rowe had been acting all the while without authority.

### V.

The judgment is vacated and the case remanded to the district court with instructions to assess Marion Square's damages and to enter an appropriate judgment for Marion Square.

REVERSED AND REMANDED.